*82 Voto disidente emitido por el
Juez Presidente Señor Her-nández Denton.
It is confidence in the men and women who administer the judicial system that is the true backbone of the rule of law. Time will one day heal the wound to that confidence that will be inflicted by today’s decision. One thing, however, is certain. Although we may never know with complete certainty the identity of the winner of this year’s Presidential election, the identity of the loser is perfectly clear. It is the Nation’s confidence in the judge as an impartial guardian of the rule of law.
Bush v. Gore, 531 U.S. 98, 128-129 (2000), opinión disidente del Juez Stevens.
Hoy, en lo que constituye un preocupante ejercicio arbi-trario de poder, cuatro miembros de este Tribunal —que recién han tomado posesión de sus cargos— han decidido promover un injustificado aumento en el número de Jueces que componen este Foro. Ello, en abierta oposición a todos los estudios, informes y recomendaciones que existen sobre el tema y sin tan siquiera fundamentar válidamente su petición ni procurar el típico consenso que entre nuestros miembros históricamente se ha buscado al solicitar una variación en nuestra composición.
La solicitud que precipitadamente hoy se cursa para au-mentar de 7 a 9 el número de nuestros miembros es improcedente. Se trata del mismo aumento que en 1994 el país rechazó cuando se le consultó sobre este asunto me-diante referéndum. Al igual que antes, no existe razón legal, práctica o institucional para justificar este incremento. El aumento es innecesario a la luz de nuestro volumen de *83 trabajo, injustificado como cuestión de buena administra-ción de fondos públicos y contrario a la práctica y la doc-trina prevaleciente en ésta y otras jurisdicciones. Disiento, pues, del dictamen que se toma indebidamente hoy.
I
A. ha solicitud de aumento es injustificada, pues: (i) se produce en momentos en que nuestro volumen de trabajo no lo amerita; (ii) sólo refleja que los nuevos compañeros aún no se han ajustado al rigor e intensidad del trabajo en este Tribunal, y (iii) ignora que hemos venido atendiendo nues-tro calendario apropiadamente, incluso con un número me-nor de Jueces, sin que éste refleje señales de inestabilidad
ha carga de trabajo de este Tribunal no justifica el au-mento solicitado. No nos enfrentamos a incrementos repen-tinos en la presentación de casos o a un volumen extraor-dinario que requiera plantearnos la muy desacreditada, y previamente rechazada,(1) alternativa de aumento que hoy solicitan cuatro Jueces de este Tribunal. Una mirada a nuestro calendario revela la improcedencia del pedido de los recién nombrados compañeros. Véase Tabla I del Anejo.
Al cierre del año fiscal 2010, este Tribunal tenía 155 “casos sometidos pendientes”, término que se refiere a aquellos casos en los que se han completado todos los trá-mites necesarios para que el Tribunal pueda resolverlos en sus méritos. Esta cifra de casos sometidos resulta conse-cuente con el promedio (141 casos) de la pasada década y apenas implica alrededor de 22 casos por cada Juez; muy por debajo de los sobre 100 casos que anualmente dispone un juez del Tribunal de Apelaciones o de los más de 1,000 *84 casos al año que maneja en su sala un juez del Tribunal de Primera Instancia. Véanse: Tablas I, II y III del Anejo.
A diferencia de lo que estiman los Jueces proponentes, no hay justificación alguna para que esa manejable carga de trabajo de 22 casos se les reduzca aún más, a alrededor de 17 casos por Juez, con la incorporación de dos Jueces adicionales.
Este asunto de los casos sometidos pendientes no sólo revela mucho sobre la aptitud para el trabajo de los nuevos compañeros sino, y peor aún, sobre la forma en que éstos conciben el ejercicio del Poder Judicial.
Los Jueces proponentes, bajo la premisa de que simple-mente ostentan una mayoría, no perciben la necesidad de hacer un análisis serio de nuestro movimiento de casos. Por ello, aunque admiten que el número de 145 casos so-metidos pendientes justificaba que en 1975 se redujera nuestra composición de 9 a 7 Jueces, abiertamente omiten decir que actualmente esa cifra se mantiene esencialmente en el mismo nivel, esto es, 135 casos sometidos pendientes para el año fiscal 2009 y 155 casos sometidos pendientes para el año fiscal 2010, aumento ocurrido después que los nuevos compañeros tomaran posesión de sus cargos.
En su lugar, y para simular que ha habido un aumento en nuestro calendario, simplemente optan por tomar, sin más, el renglón distinto de los casos totales pendientes; que, bajo la incumbencia de los nuevos compañeros, al-canzó 730 al cierre del año fiscal 2009, y 792 al final del año fiscal 2009-2010. Unen así los casos que están listos para ser resueltos (155) y los casos en trámite que aún no se pueden resolver en los méritos, no importa el número de Jueces con que cuente este Tribunal. Naturalmente, este número, por comprender todos los casos pendientes y no sólo los sometidos, ha de resultar mayor, y que, de hecho, *85 alcanzaba la cifra de 507 para la fecha pertinente en 1975.(2)
Realmente, vemos que el número comparable con los 145 que invocan los Jueces proponentes como un número razonable en 1975, apenas ha aumentado a 155 en el año 2010. ¿Cómo pueden justificar un aumento de dos Jueces para atender 10 casos más (de 145 a 155), según el total al cierre del año fiscal 2009-2010? No existe, por supuesto, justificación alguna.
Ahora bien, retomando la mirada a nuestro calendario, podemos ver que el nivel de casos presentados y resueltos tampoco ha experimentado un incremento significativo que justifique expandir nuestra composición. Si examinamos el número de casos presentados durante el año fiscal 2009-2010 (1,390 casos) notamos que éste se ajusta a la expe-riencia promediada de los últimos diez años (1,297 casos). De hecho, el número actual de casos presentados resulta incluso menor al de los años fiscales 2004-2005 (1,427 ca-sos), 2005-2006 (1,460 casos) y 2007-2008 (1,454 casos). Por su parte, si observamos el número de casos resueltos durante el año fiscal 2009-2010 (1,328 casos) surge que dicha cifra es consecuente —e incluso un poco superior— al promedio de los últimos diez años (1,261 casos).
La realidad, pues, es que no ha habido cambios signifi-cativos en el número de casos sometidos, presentados o re-sueltos durante la pasada década. Nuestro volumen actual de casos (2,120 casos) es similar al del pasado año fiscal (1,987 casos), que a su vez es prácticamente idéntico al del año fiscal 2005-2006 (1,986 casos). Esta última cifra tam-poco se aparta significativamente (entre un 7% y 8%) con respecto a los años fiscales 2004-2005 (1,850 casos) y 2007-2008 (1,831 casos).
Lo que sí ha podido cambiar, bajo la incumbencia de los *86 cuatro compañeros Jueces Asociados recién nombrados, es el número de casos que aún no han sido considerados por el Pleno, cifra que aumentó de 291 a 429 casos, del 30 de jimio de 2008 al 30 de junio de 2009, y que, al cierre de este año fiscal 2010, nuevamente sufrió un incremento de 429 a 442 casos.
Se ha dicho que esta institución, y la comunidad jurí-dica en general, deben ser generosas en permitir holgura para que nuevos magistrados se ajusten al rigor del tra-bajo judicial que asumen cuando se incorporan a este Tribunal.(3) Ello es enteramente cierto. Lo que no puede ser cierto es que un atraso producto de dicho ajuste sea el fundamento para aumentar nuestra plantilla.
Podríamos entender que los nuevos Jueces se sientan abrumados por no estar acostumbrados al tipo de labor que genera un tribunal de última instancia al que recién se incorporan. Eso nos ha pasado a todos los que hemos ocu-pado esta posición durante los primeros años de nuestra incumbencia. Sin embargo, ninguno de nosotros promovió un aumento en la plantilla de esta Curia para reducir la carga de trabajo individual. Con el mayor respeto a los recién llegados compañeros de esta Curia, el llamado, sin embargo, es a ser laboriosos, no a pretender ser eximidos de los rigores del trabajo judicial.
En este punto debemos resaltar que la realidad es que este Tribunal ha podido atender su calendario apropiada-mente (incluso con un número menor de Jueces durante el periodo de vacantes de Jueces Asociados surgidas en el pa-sado cuatrienio(4) sin que se hayan observado señales de *87 inestabilidad en éste. Según muestra la próxima tabla, y estudios externos confirman,(5) la resolución de casos in-cluso reflejó un incremento en relación con las referidas vacantes judiciales.
RELACIÓN ENTRE EL NÚMERO DE JUECES Y LOS CASOS RESUELTOS
[[Image here]]
De hecho, si analizamos el movimiento de casos desde la última vez que pasamos juicio sobre nuestra composición numérica en 1994,(6) para comparar nuestro desempeño antes del surgimiento (años fiscales 1995-2004), y durante la persistencia (años fiscales 2005-2009), de las vacantes de Jueces Asociados surgidas el pasado cuatrienio, pode-mos ver que durante el periodo de vacantes (años fiscales 2005-2009), y en comparación con el referido periodo que le antecedió (años fiscales 1995-2004), en promedio anual, este Tribunal: (i) resolvió más casos anuales (1,335 casos en lugar de 1,119), (ii) dejó menos casos pendientes (477 *88 casos en lugar de 518), aun cuando (iii) se enfrentó a más casos presentados al año (1,397 casos en lugar de 1,081). Nótese, igualmente, que para el periodo 2005-2009 el Tribunal, en promedio anual, redujo su nivel de casos someti-dos pendientes (139 en vez de 148) y sólo tuvo 68 casos adicionales anualmente promediados en trámite de perfec-cionamiento (400 frente a 332). Véanse: Tablas IV y V del Anejo.
Incluso, si damos una mirada histórica a nuestro calen-dario y, para fines de referencia, llegamos tan lejos como el inicio constitucional de este Tribunal (años fiscales 1953-1994) para compararlo con la experiencia habida durante el periodo de vacantes (años fiscales 2005-2009), podemos ver que la experiencia promediada de los años 2005-2009 de vacantes arroja: (i) menos casos pendientes (477 en lu-gar de 594), (ii) más casos resueltos (1,335 en lugar de 1,180) y (iii) un porcentaje promediado superior de casos resueltos (71.2% en lugar de 65.5%), que para los 42 años que comprenden el periodo comparativo promediado de 1953-1994. Véanse: Tablas VI y VII del Anejo.
De dicha comparación tampoco surge incremento al-guno que justifique siquiera considerar aumentar la com-posición de este Tribunal. No ha habido incrementos signi-ficativos en el número promediado de casos presentados (1,397 para el periodo 2005-2009; 1,206 para el periodo 1953-1994) o en el volumen promediado de casos (1,874 para el periodo 2005-2009; 1,800 para el periodo 1953— 1994).
De ordinario, el que nuestro volumen de trabajo actual no sustente un aumento en nuestra plantilla sería sufi-ciente para refutar la petición que hoy se formula. Pero hay más.
B. El aumento propuesto resulta, además, injustificado por ocurrir en momentos en que se anticipa una reducción en nuestra carga de trabajo así como por ser contrario a la *89 buena administración de fondos públicos y la doctrina pre-valeciente en ésta y otras jurisdicciones
La actuación de los cuatro compañeros Jueces Asociados es aún más difícil de entender jurídicamente si tomamos en cuenta que ésta ocurre, no sólo cuando nuestro volumen de trabajo actual no lo requiere sino, incluso, cuando se anticipa su disminución tras la aprobación de las nuevas Reglas de Procedimiento Civil. (7) Como se sabe, las referi-das reglas reducen las instancias en las que se puede acu-dir vía certiorari al Tribunal de Apelaciones.(8) Esto limita el universo de casos revisables ante nos y, por ende, redu-ciría nuestra carga de trabajo. Además, la petición de au-mento se produce en momentos en que las estadísticas re-flejan una merma aun en la presentación de casos ante el Tribunal de Primera Instancia. Véase Tabla III del Anejo.
Resulta, pues, particularmente cuestionable que se pre-tenda aumentar la composición de este Foro, no sólo cuando nuestro volumen de trabajo no lo amerita sino, in-cluso, justo cuando se anticipa que la carga se reduzca.
El aumento propuesto resulta injustificado, además, como cuestión de buena administración de fondos públicos. Irónicamente, tres de los compañeros Jueces Asociados que ahora reclaman la millonaria(9) inversión de fondos públi-cos que supondría incorporar jueces adicionales propues-tos, hace poco tomaban “conocimiento judicial” de la crisis fiscal local para sumariamente imponer una medicina de *90 austeridad a miles de trabajadores puertorriqueños-,(10) “co-nocimiento” que súbitamente se ha desvanecido.
Formular esta solicitud de aumento no es responsable con el país, que atraviesa momentos económicos difíciles y que sería mejor servido si se usaran esos recursos, no para que los nuevos compañeros se sigan reduciendo su mane-jable carga de trabajo, sino para fortalecer, en todo caso, otras áreas del sistema judicial, como el Tribunal de Pri-mera Instancia.
Como si lo anterior fuera poco, la petición de aumento también resulta contraria a la práctica y la doctrina pre-valecientes en ésta y otras jurisdicciones. Por la mayor parte de nuestra historia constitucional, la composición de este Tribunal ha estado fijada en 7 Jueces. Esto no es accidental. Se trata, según nota la American Bar Association, (11) de la composición más típica y satisfactoria bajo el esquema jurídico estadounidense, donde la inmensa mayo-ría de las jurisdicciones estatales (45 estados) tienen Tribunales Supremos de 7 Jueces o menos.(12)
Aunque los nuevos compañeros Jueces Asociados prefie-ren no abordar este asunto, la realidad es que las 5 juris-dicciones estatalesp(13) que no siguen la composición típica de 7 jueces, o menos, prevaleciente en el 90% de los estados (45 de 50) difieren marcadamente de Puerto Rico, bien con respecto al volumen de casos presentados, el tamaño de la población que atienden o el sistema de revisión apelativa existente. Véase Tabla VIII del Anejo.
Según advertía el entonces Juez Presidente José Trías *91 Monge,(14) un número alto de jueces en un tribunal supremo (como sería el nuevo total de 9 jueces hoy solicitado) dificulta su labor, en vez de facilitarla, al retrasar la solu-ción de casos y la pauta de normas legales. Este Tribunal conoce esto muy bien, pues en el pasado (1961-1975),(15) experimentamos con un Foro aumentado de 9 Jueces, como el ahora propuesto, que tuvo que ser revertido por consti-tuir “una pesada organización de nueve miembros en la que unos estorban a otros”.(16)
La literatura jurídica consecuentemente refleja, y nues-tra experiencia reafirma, que un aumento como el que hoy se pretende es contraproducente para el funcionamiento de este Tribunal. Según indicó el entonces Juez Presidente del Tribunal Supremo federal, Charles Evans Hughes (cuando el Presidente Franklin D. Roosevelt intentó, sin éxito, au-mentar indebidamente la composición de dicho Foro), un incremento en el número de jueces de un tribunal supremo afecta su eficiencia al haber más jueces para oír, discutir y decidir. (17)
Como se ha notado, “los estudios que existen sobre este tema en Estados Unidos y en Puerto Rico demuestran que el aumento en la composición de un tribunal colegiado puede significar más atraso[.]”(18) Esto pues, aunque “[u]n aumento en el número de jueces podría significar más plu-mas a las que se pueden asignar la redacción de decisiones ... también significa más mentes que tendrían que consul- *92 tarse sobre qué decidir y cómo decidirlo, lo que en ocasio-nes puede retrasar aún más el proceso decisional”. (19)
Es por esta razón que jueces que formaron parte de este Tribunal durante el período que estuvo constituido por 9 miembros describieron el aumento como un “experimento [que] fracasó” y que resultó “dañin[o] a nuestro sistema de justicia”. (20) En este sentido, conviene recordar que el fa-llido experimento de aumento a 9 jueces de 1961 ocurrió en momentos en que nuestro sistema legal carecía de un foro apelativo intermedio.(21) Con el establecimiento de las se-siones apelativas en el Tribunal Superior en 1974, que sir-vió de antesala al regreso a un Tribunal de 7 jueces por virtud de la legislación de 1975, se pudo desarrollar el ca-mino para subsanar este vacío con la eventual incorpora-ción de un Tribunal de Apelaciones.(22)
Es por ello que el reclamo de expansión de los recién nombrados compañeros Jueces Asociados se torna particu-larmente injustificado si consideramos que actualmente somos asistidos en nuestra carga apelativa por un tribunal de apelaciones que, con sus 39 jueces, es numéricamente superior a la inmensa mayoría de los foros apelativos in-termedios estatales. Con sus 39 jueces, Puerto Rico excede por mucho la mediana de 15 jueces apelativos intermedios que se calcula por estado.(23) De hecho, valga destacar que 11 estados ni tan siquiera tienen un tribunal apelativo in- *93 termedio y que, de los 39 que sí lo tienen, Puerto Rico su-pera a 32 en cantidad de jueces.(24)
La infundada decisión que hoy unos pocos, de los mu-chos que les han antecedido, toman para procurar una va-riación en nuestra composición, diverge sustancialmente de lo que ha sido nuestra firme tradición de actuar ponde-rada y colegiadamente al ejercer la delicada facultad que a tales efectos nos concede la Constitución. En la larga his-toria de este Tribunal, en sólo tres ocasiones (1952,(25) 1961 y 1975) hemos solicitado modificar nuestra composición. Para ello siempre ha habido el más absoluto consenso en-tre nuestros miembros en cuanto a su procedencia. (26) Hoy, sin embargo, cuatro compañeros Jueces Asociados, sin in-cluso tener el beneficio de haber ejercido por un tiempo apropiado su cargo, se desvían del entendido institucional que en todo momento nos ha guiado y optan por actuar al margen de la deliberación jurídica y la colegiación que ca-racterizó nuestros procesos anteriores. Ello empaña seria-mente la legitimidad de este Foro.
II
Este Tribunal está en condiciones de ejercer su función judicial con el número de jueces que actualmente tiene. Así lo hemos reconocido anteriormente al rechazar, con el aval del propio electorado, el mismo aumento que hoy se pretende. Véanse: In re Reforma Judicial, 136 D.P.R. 1, 3 *94 (1994); Referéndum sobre Enmiendas a la Constitución de Puerto Rico de 1994.(27)
Temo que insistir en este aumento, sin tener razón vá-lida para ello, ocasionará un enorme daño a la legitimidad de este Foro y agrietará los cimientos de nuestro Estado democrático constitucional de derecho. No podemos, pues, permanecer callados.
La adherencia a la ley y a un sistema de régimen de derecho está basada en el respeto que socialmente se tiene sobre las instituciones que administran la justicia. Véase Bush v. Gore, 531 U.S. 98, 128-129 (2000), opinión disi-dente del Juez Stevens. Nuestra autoridad descansa en el entendido de que actuamos fundamentada e imparcial-mente, libre de influencias político-partidistas. Si se per-cibe que operamos fuera de dicho entendido, se desvane-cerá el apoyo y el respeto que nos tiene el país. Sin esa confianza pública, este Tribunal no puede funcionar.
Lo anterior es particularmente importante cuando, como ahora, se trata de variar la composición de este Foro, la principal instancia en la que este Tribunal debe demos-trar que sus decisiones emanan de un proceso deliberativo legalmente fundamentado y judicialmente independiente. La legitimidad de este Foro podría verse seriamente com-prometida si, ante la ausencia de razones objetivas para sustentar la petición de aumento que hoy se formula, se percibe que los cuatro nuevos compañeros Jueces Asocia-dos se han apartado del mandato de la ley para simple-mente realizar un Court-packing, en su modalidad criolla de “Court-packing from within the bench”, sacrificando su independencia de las dos ramas políticas del gobierno.
Y es que el aumento que sin justificación hoy procuran los Jueces proponentes se asemeja más al ejercicio del po-der político (del que deberían mantener su independencia) que a un acto de la esfera judicial, el cual se ejerce de manera fundamentada con la ley como única guía. Véase *95 Planned Parenthood of Southern PA. v. Casey, 505 U.S. 833, 865-866 (1992).
En una sociedad libre y democrática resulta necesario contar con una judicatura independiente que pueda prote-ger los derechos del pueblo de intervenciones gubernamen-tales indebidas. Véase 1 Diario de Sesiones de la Conven-ción Constituyente 452 (1961). Abdicar dicha indepen-dencia, para hacer de este Tribunal una marioneta de las ramas políticas, trastoca el delicado balance de poderes en nuestro ordenamiento constitucional en la medida que in-muniza las actuaciones del Estado de una apropiada revi-sión judicial.
Irónicamente, el mecanismo de variación que hoy inde-bidamente se desvirtúa estuvo pensado por los constitu-yentes como garantía de esa independencia. Diario de Se-siones, supra, pág. 455. Algunos delegados, sin embargo, temieron que aún ese mecanismo no podría proteger al país de “jueces del Supremo [que] resultaran jueces flojos” que sucumbieran a presiones externas para impulsar, desde adentro, una versión tropical del Court-packing plan. Diario de Sesiones, supra, pág. 538.
Ningún mecanismo, estimaba el delegado Leopoldo Figueroa Carreras, podría ser garantía suficiente contra jue-ces que, adoleciendo de las “flaquezas [que sienten algunos] por afecto, por cariño, ... por ciertas presiones en relación con ciertos deudos o ciertos relacionados, [o] por-que les es más cómodo vivir en armonía con el ejecutivo y con los hombres que están en el poder”, no estuvieran prestos a detener al que intentara “met[er] su mano pecadora en el Supremo” para realizar un “Court-packing”. Diario de Sesiones, supra, pág. 538. Como fundamento a su preocu-pación, el delegado Figueroa Carreras planteó el siguiente supuesto:
Supónganse el compañero que ... [e]ntonces, dos jueces, que designó el Ejecutivo, se acercan a otros jueces y la situación es la siguiente: los jueces resisten, resisten, resisten. Entonces el *96 Ejecutivo no puede lograr su propósito; pero, como el Ejecutivo tiene ciertos medios a su alcance, porque ser jefe del gobierno de un país con ciento cuarenta y pico de millones de pesos, con todos los jefes de departamentos en los bolsillos, con todas las autoridades a sus pies ... da cierta fuerza, da cierta fortaleza. En esas condiciones el jefe ejecutivo, pues, se acerca a través de los dos que eligió; consigue, por ejemplo, dos más; y dos más, pues, son cuatro. Entonces, esos cuatro se reúnen. Cua-tro es la mayoría de siete; y entonces piden que se reorganice el Tribunal!.] Diario de Sesiones, supra, pág. 561.
La preocupación planteada, sin embargo, no se creyó posible. Y no se pudo haber creído posible porque la idea de que jueces de este Tribunal abdiquen su independencia y procuren un indebido aumento en nuestra composición es contraria a todo lo que aspiramos como Pueblo. Luce, no obstante, que no hemos podido escapar el augurio. El in-tento que por tanto tiempo se temió, ahora parece provenir desde adentro. Se le ha lanzado así un duro golpe a esta institución, al país y a nuestro sistema constitucional de-mocrático, del que nos tomará mucho tiempo reponernos.
III
En conclusión, no podemos avalar la solicitud que hoy formulan cuatro Jueces Asociados para aumentar de 7 a 9 el número de Jueces que componen este Tribunal. El au-mento propuesto no tiene justificación alguna. Constituye, más bien, un cuestionable ejercicio del poder judicial que no logra anclarse en razonamiento objetivo alguno. Esto es sumamente preocupante.
En un Estado democrático de derecho, como el nuestro, a este Tribunal le está vedado actuar por capricho, usando como único criterio que se cuente con cuatro votos para endosar una acción. Nuestras determinaciones tienen que estar subordinadas a la ley, y así fundamentarse. No existe autoridad para ejercitar el poder arbitrariamente. Así lo exigen las más básicas nociones de seguridad jurídica, o “rule of law”, al que todos estamos sujetos.
*97 Lo anterior es particularmente importante cuando, como hoy, se pretende variar la composición de este Foro en tanto se trata de la instancia más emblemática en la que debemos amparar nuestras acciones sobre bases jurídicas apropiadas para legitimar el ejercicio de nuestra autoridad. Un cambio en nuestra composición no puede procurarse infundadamente, como pretenden hacer los re-feridos compañeros Jueces Asociados, por el mero hecho de que existan cuatro votos para ello. Operar fuera de una percepción de objetividad menoscaba la confianza del país en esta institución. Ello lacera nuestro sistema constitucio-nal democrático.
Durante el tiempo que se ha mantenido fija nuestra composición en 7 miembros, múltiples Jueces han pasado por este Tribunal y han hecho su trabajo como el país ha esperado de ellos sin solicitar que se aumente nuestra plantilla. ¿Qué ha cambiado en la realidad institucional de este Tribunal que justifique ahora esta solicitud de au-mento? Nada, absolutamente nada, salvo por la llegada a este Tribunal de cuatro nuevos Jueces Asociados que ape-nas se han incorporado a sus cargos y que hoy demuestran que aún pasan por el proceso de ajuste por el que todos hemos pasado al incorporarnos a este Foro.
La ausencia de razones objetivas para sustentar el au-mento propuesto arroja una oscura sombra sobre este Tribunal que hace cuestionar si se ha guardado la debida dis-tancia del “flujo de la marea” política o, incluso, del lema un poco más burdo de “banquete total”, que alude a la idea de controlar este Tribunal a través de jueces que operaran bajo criterios estrictamente partidistas. Decíamos antes y repetimos ahora que, a la larga, es nuestra institución la que sufre y se desprestigia ante el país.(28)
A modo de reflexión final, me parece pertinente compar-tir algunos datos sobre mi experiencia personal referente a *98 cuando llegué a este Tribunal hace veinticinco años. Como expresé anteriormente, al incorporarme a este Foro como Juez Asociado en 1985, el entonces Juez Presidente José Trías Monge me asignó sobre 55 casos sometidos. Aunque a primera instancia me sentí abrumado e impresionado por la magnitud de esa encomienda, atendí mis nuevas funcio-nes con gran empeño, dedicación y esmero. Y es que no puede ser de otra forma, pues al juramentar como Jueces del máximo foro judicial del país nos comprometemos con el Pueblo a laborar incansablemente por la búsqueda de la verdad y la justicia.
El expediente histórico demuestra que desde esos pri-meros años he trabajado con mucha rigurosidad y dedica-ción por resolver los casos que me han sido asignados. A la misma vez he servido a este Foro en diversas facetas ad-ministrativas, como la presidencia de la Junta Examina-dora, incluso antes de juramentar como Juez Presidente del Tribunal.
Todos los Jueces que hemos formado parte de esta Curia entendemos que la gran responsabilidad que conlleva esta posición no puede ser tomada de forma ligera. Asimismo, comprendemos que los primeros años en el Tribunal re-quieren un alto grado de sacrificio para poder ajustar nues-tras vidas a la nueva dinámica profesional.
Sin embargo, sabemos que aumentar el número de jue-ces que componen este Tribunal no va a aliviar la carga de trabajo de los nuevos compañeros. Si tienen una preocupa-ción sobre los procedimientos de manejo de casos lo que corresponde es buscar juntos una solución colegiada sin ceder a la tentación de requerir a los otros poderes del gobierno que aumenten la plantilla de este Foro. Si no hay razones legítimas y sus fundamentos tratan de meros sub-terfugios, ¿cuál es la motivación real para aumentar el nú-mero de Jueces? ¿Es una confirmación de que no tenemos la capacidad para trabajar como el país espera de nosotros *99 o responde a otras motivaciones ajenas al quehacer judicial?

Hoy, 5 de noviembre de 2010, se escribe un capítulo muy triste en la historia de esta centenaria institución. Tomará más de una generación de Jueces restablecer su prestigio y volver a ganar la confianza del país.

Tabla I

MOVIMIENTO DE CASOS AÑOS FISCALES 2000-2001 A 2009-2010(29)
[[Image here]]
Sometidos del año anterior
Casos considerados por el Pleno en los que se ha emitido orden a las partes
Casos que no han sido considerados por el Pleno
Casos considerados por el Pleno en los que se ha emitido orden a las partes
Casos que no han sido considerados por el Pleno
Casos sometidos pendientes
2000-01 112 134 191 1,138 1,575 1,143 169 89 174
2001-02 174 169 89 1,154 1,586 1,218 172 61 135
2002-03 135 172 61 1,116 1,484 1,030 172 173 109
2003-04 109 172 173 1,187 1,641 1,218 157 126 140
2004-05 140 157 126 1,427 1,850 1,324 171 219 136
2005-06 136 171 219 1,460 1,986 1,544 246 75 121
2006-07 121 246 75 1,276 1,718 1,341 108 126 143
2007-08 143 108 126 1,454 1,831 1,211 168 291 161
2008-09 161 168 291 1,367 1,987 1,257 166 429 135
2009-10 135 166_429 1.390 2,120 1,328 195 . 442_155
Promedio 166 178 1,297 1,778 1,261 172

Tabla II

Volumen de Casos por Juez Tribunal de Apelaciones(30)
[[Image here]]
Presentados Resueltos
2001 33 3891 3958 118 120
2002 31 3929 3889 127 125
2003 33 4198 3891 127 118
2004 33 4286 3910 130 118
2005 36 4279 4586 119 127
2006 39 4681 4752 120 122
2007 35 4898 4748 140 136
2008 39 5625 5647 144 145
2009 37 5607 5603 152 151
2010 38 _5424_ 5436 143 143
Promedios 35 4682 4642 132 131

*100
Tabla III

Volumen de Casos por Juez Tribunal de Primera Instancia(31)
[[Image here]]
Presentados Resueltos
2001 310 361464 355431 1166 1147
2002 314 366901 359049 1168 1143
2003 307 381084 389086 1241 1267
2004 302 379716 374756 1257 1241
2005 327 368011 365822 1125 1119
2006 328 377712 377243 1152 1150
2007 316 395259 376227 1251 1191
2008 310 367114 385534 1184 1244
2009 306 348914 355860 1140 1163
2010 317 345092 345294 1089 1089
Promedios 314 369127 368430 1177 1175

Tabla IV

MOVIMIENTO DE CASOS PERIODO 1995-2004(32)
[[Image here]]
Casos sometidos pendientes
En trámite de perfeccio-namiento
1994-95 803 1,247 2,050 1,432 69,85% 196 422
1995-96 618 756 1,374 828 60.26% 156 390
1996-97 546 722 1,268 814 64.20% 165 289
1997-98 454 1,101 1,555 970 62.38% 163 422
1998-99 585 1,131 1,716 1,229 71.62% 133 354
1999-00 487 1,260 1,747 1,310 74.99% 112 325
2000-01 437 1,138 1,575 1,143 72.57% 174 258
2001-02 432 1,154 1,586 1,218 76.80% 135 233
2002-03 368 1,116 1,484 1,030 69.41% 109 345
2003-04 454 1,187 1,641 1,218 74.22% 140 283
Promedio 518 1,081 1,600 1,119 69.9% 148

Tabla V

MOVIMIENTO DE CASOS PERIODO 2005-2009(33)
Pendientes Presentados Volumen Resueltos al comenzar %Resueltos Casos al finalizar el año
Casos sometidos pendientes
En trámite de perfeccio-namiento
Año Fiscal2004-05 423 1,427 1,850 1,324 71.57% 136 390
2005-06 526 1,460 1.986 1,544 77.74% 121 321
2006-07 442 1,276 1,718 1,341 78.06% 143 234
2007-08 377 1,454 1,831 1,211 66.14% 161 459
2008-09 620 1,367 1.987 1,257 63.26% 135 595
Promedio 477 1,397 1,874 1,335 71.2% 400

*101
Tabla VI

MOVIMIENTO DE CASOS COMPARACIÓN DE PROMEDIOS PERIODOS 1953-1994 y 2005-2009(34)
Periodos
Promedio Pendientes al comenzar el año
Promedio Presentados
Promedio Volumen
Promedio Resueltos
% Promedio Resueltos
1953-1994 594 1,206 1,800 1,180 65.5%
2005-2009 477 1,397 1,874 1,335 71.2%

Tabla VII

MOVIMIENTO DE CASOS PERIODO 1953-1994(35)
Año Pendientes al Fiscal comenzar el año Presentados Volumen Resueltos % Resueltos
1952-53 264 800 1,064 685 64.38%
1953-54 379 759 1,138 650 57.12%
1954-55 488 698 1,186 680 57.34%
1955-56 506 645 1,151 524 45.53%
1956-57 627 727 1,354 824 60.86%
1957-58 530 745 1,275 593 46.51%
1958-59 682 811 1,493 835 55.93%
1959-60 658 991 1,649 955 57.91%
1960-61 694 1,056 1,750 1920 52.57%
1961-62 830 1,152 1,982 1,346 67.91%
1962-63 633 1,049 1,682 1,110 65.99%
1963-64 572 1,059 1,631 1,018 62.42%
1964-65 613 1,111 1,724 1,126 65.31%
1965-66 625 1,343 1,968 1,092 55.49%
1966-67 817 1,150 1,967 1,186 60.29%
1967-68 779 1,089 1,868 1,120 59.96%
1968-69 748 809 1,557 952 61.14%
1969-70 603 834 1,437 857 59.64%
1970-71 579 818 1,397 821 58.77%
1971-72 576 901 1,477 813 55.04%
1972-73 664 995 1,659 1,036 62.45%
1973-74 623 1,069 1,692 1,065 62.94%
1974-75 629 1,083 1,712 1,343 78.45%
1975-76 369 1,204 1,573 1,123 71.39%
1976-77 450 1,248 1,698 1,309 77.09%
1977-78 389 1,136 1,525 1,245 81.64%
1978-79 280 1,170 1,450 1,165 80.34%
1979-80 285 1,382 1,667 1,308 78.46%
1980-81 359 1,469 1,828 1,376 75.27%
1981-82 452 1,508 1,960 1,693 86.38%
1982-83 267 1,669 1,936 1,649 85.18%
1983-84 287 1,599 1,886 1,605 85.10%
1984-85 281 1,613 1,894 1,471 77.67%
1985-86 423 1,656 2,079 1,540 74.07%
1986-87 539 1,730 2,269 1,542 67.96%
*102 1987-88 Año Fiscal (cont.)
727 Pendientes al comenzar el año (cont.)
1,520 Presentados (cont.)
2,247 Volumen (cont.)
1,467 Resueltos (cont.)
65.29% % Resueltos (cont.)
1988-89 780 1,701 2,481 1,539 62.03%
1989-90 942 1,890 2,832 1.721 60.77%
1990-91 1,111 1,640 2,751 1,587 57.69%
1991-92 1,164 1,681 2,845 1.722 60.53%
1992-93 1,123 1,291 2,414 1,296 53.69%
1993-94 592(36) 1,850 (37) 2,442 1,639_67,12%
Promedio 594 1,206 1,800 1,180 65.5%

Tabla VIII

NÚMERO DE JUECES EN LOS TRIBUNALES ESTATALES DE ÚLTIMA INSTANCIA EN RELACIÓN CON SU RANGO POBLACIONAL Y LOS CASOS PRESENTADOS (Compilación de 2007)(38)
Estado Casos Número de Rango Presentados Jueces Poblacional
California 8,984 7 1
T©x3.s 2
—Supreme Court 1,086 9
—Court of Criminal Appeals 8,925 (9)
New York 3,770 7 3
Florida 2,524 7 4
Illinois 2,839 7 5
Pennsylvania 3,038 7 6
Ohio 2,459 7 7
Michigan 2,612 7 8
*103 Estado (cont.)
Casos Presentados (cont.)
Número de Jueces (cont.)
Rango Poblacional (cont.)
Georgia 1,877 7 9
North Carolina 748 7 10
New Jersey 3,358 7 11
Virginia 2,634 7 12
Washington 1,585 9 13
Massachusetts 967 7 14
Arizona 1,161 5 16
Tennessee 1,085 5 17
Missouri 823 7 18
Maryland 886 7 19
Wisconsin 988 7 20
Minnesota 774 7 21
Colorado 1,534 7 22
Alabama 1,843 9 23
South Carolina 1,706 5 24
Louisiana 2,497 7 25
Kentucky 998 7 26
Puerto Rico — — 27
Oregon 1,182 7 28
Oklahoma 29
—Supreme Court 1,856 9
—Court of Criminal Appeals 1,287 (5)
Connecticut 223 7 30
Iowa 2,197 7 31
Mississippi 1,143 9 32
Arkansas 613 7 33
Kansas 1,057 7 34
Utah 564 5 35
Nevada 2,198 7 36
New Mexico 623 5 37
West Virginia 3,954 5 38
Nebraska 541 7 39
Idaho 785 5 40
Maine 774 7 41
New Hampshire 964 5 42
Hawaii 248 5 43
Rhode Island 358 5 44
Montana 751 7 45
Delaware 666 5 46
South Dakota 405 5 47
Alaska 412 5 48
North Dakota 366 5 49
Vermont 530 5 50
District of Columbia — — 51
Wyoming 307 5 52

 Véanse: In re Composición del Tribunal Supremo, Resolución de 19 de febrero de 1975; Ley Núm. 29 de 28 de mayo de 1975, (Parte 1) Leyes de Puerto Rico 65.

 Véase Informe Anual del Director Administrativo de los Tribunales, corres-pondiente al año fiscal 1974-1975, Tablas A2-A3.

 Véase A. García Padilla y J.J. Álvarez González, El Tribunal Supremo de Puerto Rico: la Corte Pons, 59 (Núm. 2) Rev. Jur. U.P.R. 185, 195-196 (1990).

 Durante los años fiscales 2003-2004 y 2004-2005 el Tribunal funcionó con 6 jueces por períodos cortos a raíz del retiro de los entonces Jueces Presidentes Señor José A. Andréu García y Señora Miriam Naveira Merly. El número se redujo defini-tivamente a 6 a partir del 10 de abril de 2005 con el retiro del Juez Asociado Señor Baltasar Corrada del Río. Para el año fiscal 2007-2008, el número de jueces se *87 redujo a 5 a partir del 3 de diciembre de 2007 con el deceso del Juez Asociado Señor Jaime B. Fuster Berlingeri. Por su parte, durante el año fiscal 2008-2009 el número de jueces se redujo a 4 con el retiro del Juez Asociado Señor Francisco Rebollo López el 31 de julio de 2008. El 10 de marzo 2009 tomaron posesión del cargo los Jueces Asociados Señor Rafael Martínez Torres, Señor Erick V. Kolthoff Caraballo y la Jueza Asociada Señora Mildred Pabón Charneco.

 Véase Informe de Ipsos Public Affairs de 26 de febrero de 2010, pág. 3.

 Véase In re Reforma Judicial, 136 D.P.R. 1, 3 (1994).

 Véase Ley Núm. 220 de 29 de diciembre de 2009, según enmendada, 32 L.P.R.A. Ap. V.

 Véase Regla 52.1 de las Reglas de Procedimiento Civil de 2009 (32 L.P.R.A. Ap. V).

 El costo mínimo de la petición de aumento podría estimarse en alrededor de $1 millón de dólares anuales. Este estimado toma en consideración el gasto por concepto de compensación para los 2 Jueces Asociados adicionales, su personal de apoyo (oficiales jurídicos, secretarias y alguaciles) y equipo (vehículo, celular, mate-riales y equipo de oficina). No incluye, entre otros, gastos por concepto de espacio físico de oficina, como sería alquiler, compra o construcción de propiedad inmueble.

 Véase Domínguez Castro et al. v. E.L.A. II, 178 D.P.R. 375 (2010), voto particular del Juez Asociado Señor Rivera Pérez, al que se unieron los Jueces Aso-ciados Señor Martínez Torres, Señor Kolthoff Caraballo y la Jueza Asociada Señora Pabón Charneco.

 Véase American Bar Association, Standards Relating to Court Organization, 1990, págs. 39-40.

 Véanse: National Center for State Courts, State Court Statistics: An Analysis of 2007 State Court Caseloads, págs. 92-93 (2009); Dept. of Justice, Bureau of Justice Statistics, State Court Organization, 2004, págs. 12-14 (2006).

 Texas, Washington, Alabama, Oklahoma y Mississippi.

 Véase J. Trías Monge, Cómo fue: memorias, San Juan, E.D.U.P.R., 2005, pág. 270.

 Véanse: In re Solicitud a la Asamblea Legislativa sobre aumento en el nú-mero de Jueces del Tribunal Supremo, Resolución de 27 de enero de 1961; Ley Núm. 7 de 6 de mayo de 1961, Leyes de Puerto Rico 37.

 L. Rafael Rivera, La justicia en sus manos: historia del Tribunal Supremo de Puerto Rico, Guaynabo, Eds. Santillana, 2007, pág. 191.

 Carta del Juez Presidente Charles Evans Hughes al senador Burton K. Wheeler (1937), reproducida en G. Gunther y Sullivan, Constitutional Law, 13ra ed., Nueva York, Ed. Foundation Press, 1997, pág. 184.

 Véase J.J. Álvarez González, La nueva Ley de la Judicatura y la competen-cia obligatoria del Tribunal Supremo: algunas jorobas de un solo camello, 65 (Núm. 1) Rev. Jur. U.P.R. 1, 29 esc. 177 (1996).

 García Padilla y Álvarez González, supra, pág. 226 esc. 121.

 “Declaración de Ex-Jueces del Tribunal Supremo”, El Nuevo Día, 1 de no-viembre de 1994, pág. 33.

 Véase Comité para el Estudio y Evaluación del Sistema Judicial, Informe al Tribunal Supremo de Puerto Rico sobre el Tribunal Supremo, abril de 1965, pág. 5.

 Véanse: J. Trías Monge, Sociedad, Derecho y Justicia, Río Piedras, E.D.U.P.R., 1986, págs. 145-146; Ley Núm. 11 de 8 de agosto de Í974, (Parte 2) Leyes de Puerto Rico 663; Resolución del Tribunal de 20 de septiembre de 1974; Orden del Juez Presidente de 25 de septiembre de 1974.

 Véase Bureau of Justice Statistics, State Court Organization 1987-2004, Department of Justice, 2007, pág. 4.

 Véase Bureau of Justice Statistics, State Court Organization, Department of Justice, 2004, págs. 12-14.

 Véanse: Resolución del Tribunal de 26 de julio de 1952; Ley Núm. 2 de 4 de agosto de 1952 (1952 Leyes de Puerto Rico 115).

5) Observamos que en 1984 este Tribunal se abstuvo de alterar su composi-ción, notando que se había “suscitado división en el seno del Tribunal sobre el nú-mero óptimo deseable” que debemos tener. Véase In re composición del Tribunal (Art. V, Sec. 3 de la Constitución), Resolución de 29 de marzo de 1984.

 Véase http://www.ceepur.org/cgi-bin/eventos.pl?evento=1994&voto=2.

 Véase In re Enmda. R. 5 Reglamento T.S., 178 D.P.R. 461 (2010), opinión disidente.

 Fuente: Oficina de Estadísticas de la Secretaría del Tribunal Supremo. Para efectos de esta tabla se han utilizado las abreviaturas siguientes: “Pres.” (Presenta-dos), “Vol.” (Volumen) y “Res.” (Resueltos).

 Oficina de Estadísticas de la Oficina de Administración de los Tribunales.

 id.

 Fuente: Periodo 1994-1995 al 1999-2000: Informes Anuales de la Rama Judicial; Periodo 2000-2001 al 2003-2004: Oficina de Estadísticas de la Secretaría del Tribunal Supremo.

 Fuente: Oficina de Estadísticas de la Secretaría del Tribunal Supremo.

 Fuente: Informes Anuales de la Rama Judicial; Oficina de Estadísticas de la Secretaría del Tribunal Supremo.

 Fuente: Informes Anuales de la Rama Judicial.

 Durante el año fiscal 1992-1993 se refirieron 526 casos al Tribunal de Apelaciones. Por ello, se reflejan 592 casos pendientes al comenzar el año fiscal 1993-1994.

 La cifra de 1,850 casos incluye 120 casos recibidos del Tribunal de Apelaciones.

 Fuente: National Center for State Courts, Examining the Work of State Courts: A National Perspective from the Court Statistics Project, pág. 44 (2009); National Center for State Courts, State Court Statistics: An Analysis of 2007 State Court Caseloads, págs. 149-153. La información reportada se refiere al año 2007, salvo para las jurisdicciones siguientes: Nevada (2006), New Hampshire (2006), New Jersey (2005), New Mexico (2006) y Oklahoma — Tribunal Supremo (2006). Deben advertirse las siguientes diferencias en la forma en que los estados subsecuentes hand reportado la información sobre casos presentados:
“Connecticut-Supreme Court (Grand total incoming ... data do not include bar discipline/eligibility appeals) ... Georgia — Supreme Court (Grand total incoming ... data do not include advisory opinion proceedings) ... Kansas — Supreme Court (Grand total incoming data do not include appeal by right administrative agency appeals) ... Pennsylvania — Supreme Court (Grand total incoming data do not include bar/judiciary proceedings) ... Texas — Court of Criminal Appeals (Grand total incoming ... data do not include certified questions) ... Utah-Supreme Court (Grand total incoming data do not include death penalty appeals by right).” (Paréntesis suplidos.) National Center for State Courts, State Court Statistics: An Analysis of 2007 State Court Caseloads, pág. 153.